IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Case No. 03-MK-72 (PAC)

WILLIAM M. LEE,

      Plaintiff,

v.

GARY WAKINS, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Defendants.

_____

**OPINION AND ORDER OVERRULING OBJECTIONS,  ADOPTING
RECOMMENDATION, AND DENYING PETITION**
_____

**THIS MATTER** comes before the Court pursuant to the Petitioner's Objections (**# 53,** as supplemented **# 54, 56**) to the August 30, 2004 Recommendation (**# 52**) of United States Magistrate Judge Patricia A. Coan that the Petition (**# 3**) for a writ of *habeas corpus* be denied. The Respondents did not file any response to the Objections.

**<u>BACKGROUND</u>**

Although many of the details described herein were and are disputed by William Lee, the Petitioner, (hereinafter "Mr. Lee"), the Court has reviewed the entire record in this matter and finds the background facts as follows.

1

**A.  The Offense**

On the night June 13, 1992, an altercation arose at a Thornton, Colorado nightclub between members of the "Gangsters of Love" and the "Crips" street gangs. After police broke up the dispute, Mr. Lee, his brother Brian Lee ("Brian"), Aaron Qualls, and Eric Lightner, all members of the Gangsters of Love, returned to Denver together.  During that drive, the four discussed taking revenge on the Crips for events during the altercation.  At some point, the four came upon a vehicle being driven by Damon Roberts, a member of the Crips.  Brian stated that he wanted to show the Crips "what a real gang-bangin' is," and the four drove to Brian's house (the "Lee residence") to retrieve a Tec-9 semi-automatic pistol and a .357 millimeter pistol.  Mr. Lee advised Qualls that they were "about to do some dirt," and Brian advised Qualls that "[t]here is going to be a murder tonight son, you don't need to get involved."  Qualls exited the car, and Mr. Lee, Brian, and Lightner returned to the area where they had seen Roberts' car.

At the time they encountered Roberts again, Roberts was driving with three passengers: Tiffany Locke in the front seat; James McGregor in the rear seat, driver's side; and Robert McGregor in the rear seat, passenger's side.  The Lee vehicle pulled alongside the driver's side of Roberts' vehicle, words were exchanged between the occupants of the cars, then shots were fired from the Lee vehicle towards the Roberts vehicle.  Roberts was shot in the leg,[1] and James McGregor was killed by the gunfire.  The tires of the Roberts vehicle were also shot out, and the car came to rest on the median.  The Lee vehicle left the scene.  When police officers arrived at the scene, Locke identified Mr. Lee and Brian by name to the officers, and told the officers where Mr. Lee and his brother lived.

_____

[1]Roberts survived the incident, but was killed prior to trial in an unrelated shooting.

2

In the meantime, Mr. Lee, Brian, and Lightner had returned to the Lee residence, where Brian told Qualls that they had shot some people and that Mr. Lee did the shooting.  Shortly thereafter, police arrived at the Lee residence and apprehended Mr. Lee, Brian, and Lightner.  Mr. Lee, Brian, and Lightner were each charged with eleven crimes: First Degree Murder of James McGregor after deliberation; First Degree Murder of James McGregor by extreme indifference; three counts of attempted First Degree Murder after deliberation of the three other passengers; three counts of attempted First Degree Murder by extreme indifference of the three other passengers; Second Degree Assault against Roberts; conspiracy to commit First Degree Murder; and conspiracy to commit First Degree Assault.

**B.  The Trial**

A joint trial of Mr. Lee, Brian, and Lightner commenced on or about April 21, 1993 in Colorado District Court, Denver County.  The prosecution first presented Denver police officer Charles Martinez, who was the first officer to arrive at the scene of the shooting.  He testified that he had briefly examined Roberts' vehicle and found no weapons inside or in the area near the vehicle.  He further testified that Tiffany Locke identified Mr. Lee and Brian by name as the people involved in the shooting and where they lived.  With this information, Officer Martinez placed a radio call to other police units in the area of the Lee residence regarding the shooting. He then searched the area and recovered fourteen shell casings and ten bullet fragments at the scene.

The prosecution then called then-16 year old Tiffany Locke.  She described an incident that occurred upon leaving the club in Thornton, in which Roberts' car was searched by the Thornton police for weapons.  Locke also described a separate incident occurring that same

3

evening, but before the events at issue here, in which "Mexican guys" had followed the Roberts vehicle from the club in Thornton and fired shots at it.  Locke testified, however, that no bullets hit the car during this encounter.   Locke then testified that she knew Mr. Lee because his girlfriend, Nakia Gilmore, was Locke's best friend, and that she had seen Brian, but did not know him. (Locke later testified that she had known Brian "for quite some time.")  Describing the altercation between Mr. Lee's and Roberts' vehicles, Locke testified that she heard gunfire from the direction of Mr. Lee's car, but could not identify where in the car it came from.  During direct examination, she denied having told the police at the scene that she knew who had been involved with the shooting, or indeed, even that she was able to identify any of the occupants of the other car.  The trial court granted the prosecution permission to lead Locke in eliciting her testimony, noting that "[s]he is clearly a hostile witness at this point."  Locke continued to deny having implicated the defendants.  She also denied that she had been threatened by Gilmore for identifying Mr. Lee and Brian.  Locke admitted that she gave a videotaped statement to the police the morning following the incident, but claimed not to remember implicating Mr. Lee and Brian in that statement.  Locke repeatedly insisted she did not remember as the prosecution described her videotaped statements identifying Mr. Lee and Brian, their car, their clothing, the manner in which Mr. Lee held the gun during the shooting, and the process by which Locke accompanied the police to the Lee residence to positively identify Mr. Lee and Brian the morning after the shooting.  The prosecution also reviewed numerous details of similar testimony Locke had given during a preliminary hearing, but Locke maintained that she could not remember anything about that prior testimony.

4

Locke was cross-examined by each of the defendants' attorneys.  Although she was relatively cooperative with regard to testifying about the events occurring at the club and the encounter with the "Mexican guys," she remained reticent to answer most questions relating directly to the shooting or the aftermath.  Locke denied that she took weapons to another individual's house to hide them at Roberts' request after the incident.  She also denied telling Mr. Lee's investigator that she had been intoxicated at the time of the events, including the time of her videotaped statement to police.   After defense counsel concluded their cross-examination, the prosecution conducted a brief re-direct examination, and defense counsel each stated they had no further questions.  At that time, the Court excused Locke from the witness stand, but directed her to remain "in 492," which this Court interprets to refer to a room or area in or near the courthouse, until the trial was completed.

The prosecution then sought to introduce the videotaped statement given by Locke.  Over defense objections, the trial court admitted the tape pursuant to C.R.S. § 16-10-201, which allows the introduction of a prior inconsistent statement as substantive evidence, if the witness is first given an opportunity to explain any inconsistency between the prior statement and the witness' trial testimony.  The foundation for the videotape was laid by police officer Robert Widmayer, who testified that he interviewed Locke when she was brought to the police station the morning following the shooting.  He described her demeanor as friendly and "more than cooperative."  He requested and obtained her permission to take a videotaped statement, and proceeded to then conduct the half-hour recorded interview.  On cross-examination, Widmayer clarified that police department procedures did not require him to obtain parental permission before taking a statement from an underage witness like Locke, and that parental permission was only required

before taking statements from underage suspects. The videotaped statement was then played for the jury.[2]

A series of police officers then testified as to the circumstances of the arrests of the defendants. Other police officers gave additional testimony about responding to the crime scene, or about certain events occurring at the club in Thornton.

The prosecution then called Dr. Thomas Henry, a forensic pathologist. Dr. Henry testified that James McGregor was killed by a gunshot wound to the chest, and that the bullet entered his chest from the front and proceeded slightly downward, traveling from his left to right, piercing his aorta. Dr. Henry acknowledged that the position of the entry wound indicated that James McGregor was facing the direction from which the bullet came, not turned away from it. Dr. Henry testified that James McGregor would have died no more than ten minutes after sustaining the wound, but that he would have been mobile up until the time of death. Dr. Henry observed that the wound was irregular, possibly suggesting that the bullet had been deflected before entering the body.

At the close of trial that day, the judge informed the counsel that Locke had apparently tendered some sort of document to court personnel after her testimony. The trial court advised counsel "Gentlemen, this is Miss Locke's most recent version. You might be interested in it." Although the contents of the document were not read into the record, the parties here do not dispute that the document read, in pertinent part:

---

[2]Neither Locke's videotaped statement nor that of Aaron Qualls, discussed later, were transcribed in the record supplied to this Court. The Court assumes that the contents of the statement are largely consistent with the representations made by the prosecution in cross-examining each witness at trial, as well as consistent with the representations of counsel in this case as to what may be found on them.

6

> This morning during cross-examination I was asked by one of the
> defense lawyers if the night of Jams McGregor's murder I was
> intoxicated.  I answered the question saying no.  Well your honor
> that is not true.  Yes I was intoxicated the night of the murder.  I
> was afraid to admit it because I am under age and at the time I was
> 15 years old.  Your honor I was smoking marijuana drinking
> alcohol and also took 1 hit of acid (LSD).  I apologize sincerely for
> lying in court today.  This is so hard on me both ends.  I have no
> family or friend support.  I'm in this alone.  Please understand how
> I feel and what I'm going through. . .  And please don't make me
> get back on the witness stand that's what scares me the most.  Also
> I did not want to take that video my mom was not present and they
> made me take it.  Please exclude the video.  I truly don't remember
> any of that really.

The trial court inquired whether anyone wanted Locke to be present the following day.  Mr. Lee's

counsel requested that Locke be present, and the Court apparently instructed the prosecution to

have her there the following morning.  The next morning, over the prosecution's objection, the

trial court decided to permit Locke to be re-called during the prosecution's case and subjected to

additional cross-examination regarding the contents of her letter.  However, by this time, Locke

had disappeared.  Mr. Lee's counsel requested that the trial court strike Locke's testimony in its

entirety, on the grounds that she was admittedly incompetent at the time of the events.  The trial

court denied that request, and directed that police personnel attempt to locate Locke and return

her to the court.

The prosecution's next witness was Aaron Qualls, Mr. Lee and Brian's cousin.  Qualls

testified that after he was arrested, he was brought to the police station where he was

accompanied by his mother and grandmother, and was read his *Miranda* rights.  Qualls testified

that before he signed the *Miranda* waiver, Officer Widmayer "mentally mistreated" him, albeit in

the presence of Qualls' mother and grandmother.  Qualls did not describe the form this

intimidation took, other than to say that Officer Widmayer was "somewhat" yelling.  Thereafter, Qualls gave a videotaped statement.  The prosecution elicited an admission from Qualls that his videotaped statement differed from his trial testimony regarding whether he returned from the club in Thornton with Mr. Lee and Brian (as he said in the taped statement), or whether he got a ride in another vehicle (as he had testified at trial), and Qualls stated that that variance was because, at the time he gave the statement, he "was afraid of getting 40 years in the penitentiary."  He contended that Officer Widmayer had supplied him with details about the events of the evening in a conversation prior to the interview, and that Qualls, during the recorded session, merely recited those details that Widmayer had given him.  Explaining other comments he made during the recorded statement, including details about Brian and Mr. Lee discussing their plans to obtain a gun and find Roberts, Qualls testified that he "just made it up."  As with Locke, the prosecution then explored various comments made by Qualls on the videotape, with Qualls contending that he could not remember having made such comments, or stating that he just made up the comments at the time.  Qualls acknowledged that he, accompanied by an attorney his mother had hired for him, watched the videotape with prosecution investigators just prior to the preliminary hearing in the case, and at that time, he did not make any assertion that his statements on the tape were coerced or fabricated.  Qualls admitted that he was reluctant to testify at the preliminary hearing out of fear that members of the Crips might see him and think that he was involved in the incident.  He acknowledged that his psychiatrist had written to the prosecution stating that Qualls feared retribution from the Gangsters of Love, although Qualls contended that his psychiatrist has misunderstood him.

On cross-examination, Qualls stated that heard Mr. Lee, Brian, and Lightner discussing having been involved in a shooting when they returned to the Lee residence after the incident, but he persisted that he had had no contact with them that evening until after the shooting had happened. He partially recanted his direct testimony that he had "made up" the fact that a Tec-9 had been involved, that Mr. Lee had shot at another car, and that that car was left stopped in the street, admitting on cross that he had overheard the defendants mention these facts in their post-shooting conversation. (Later in the cross-examination, Qualls recanted his admission to having overheard a statement that Mr. Lee had been doing the shooting.) When examined by Mr. Lee's attorney, Qualls admitted that he may have told police that Mr. Lee was wearing a shirt similar to one that Qualls had been wearing that evening, in an attempt to explain away Locke's identification of a person wearing that shirt in the Lee car during the shooting.

The prosecution also called Armedia Gordon, a supervisor in the Denver police department homicide unit. She observed Locke talking to Officer Widmayer at the police department, and considered Locke's demeanor to be friendly and cooperative and Officer Widmayer to be professional and courteous towards Locke. Gordon confirmed that police procedures do not require police to contact the parents of a juvenile witness before taking a statement. She also observed Qualls at the police station, noting his demeanor as quiet and somber, but cooperative. She denied that Officer Widmayer pressured Qualls. Gordon also participated in a search of the Lee residence. No weapons were found in or about the property. Two cars were towed from the property to the police station, where Gordon obtained a warrant to search the interior of the cars. Inside the trunk of a yellow Pontiac (a vehicle which was not alleged to have been involved in the incident), Gordon found a Tec-9 pistol and insurance papers

belonging to "William Lee." Gordon acknowledged that she did not know whether the insurance papers belonged to Mr. Lee or his father, both of whom share the same name. She also testified that, during her discussions with Locke, Locke claimed that Roberts was her brother and that she never saw Mr. Lee firing during the incident.

The prosecution's ballistics expert, Frank Kerber, testified that the shell casings and bullet jackets recovered from the site of the shooting, as well as a bullet fragment recovered from the tire of Roberts' car, were fired from the Tec-9 pistol found by Gordon, but that the bullet found in James McGregor's chest was not fired by that weapon. Kerber could not conclusively identify the type of weapon that fired the bullet found in James McGregor, but observed that it was a .9 millimeter weapon with either a .357 or .38 caliber, likely a Smith & Wesson revolver. Kerber also opined that although a bullet fragment recovered from Roberts' thigh could not be positively matched with the bullet in James McGregor's chest, both bullets had the same class characteristics. This lead Kerber to conclude that they were fired from the same gun. Kerber noted that a black sweatshirt, said to belong to Roberts, was also found to have a bullet fragment in its fabric, as well as a hole indicating that the bullet entered through the chest of the sweatshirt. Kerber did not believe that the bullet came from the Tec-9, and opined that, given it coming to rest inside the fabric of the sweatshirt, it may have struck some other object before coming to rest.

The prosecution then called Robert Sestrich, an investigator with the Denver police. He testified as to a meeting with Locke, Locke's mother, Locke's attorney, and the District Attorney, in which they discussed why Locke's testimony at the preliminary hearing had retreated from her earlier identification of the defendants. According to Sestrich, Locke claimed that her friend Nakia Gilmore had told her "it was fucked that she had told the police who had done this," and

that Locke claimed she was intimidated by the number of family members and friends of the defendants in the courtroom gallery at the time.

The prosecution then recalled Officer Widmayer.  He discussed the nature of his preliminary contact with Qualls at the police department, and denied having threatened or coerced Qualls or that he had coached Qualls with any details of the incident.  Officer Widmayer also conducted the search of the Lee vehicle after it was taken into police custody.  He found papers in the vehicle relating to both Mr. Lee and Brian, as well as to Tamara Fields, the registered owner of the car.  He observed that there were no bullet holes in the body or glass of the car.  Before cross-examination of Officer Widmayer, the prosecution played the videotape of Qualls' statement.  When defense counsel concluded their cross-examination of Officer Widmayer, the prosecution rested.

The defense called several witnesses to establish various facts, including: that tests did not establish that any of the defendants had gunpowder residue on their hands at the time of their arrests; that both vehicles contained metals that might be indicative of gunpowder residue; that no fingerprints were recovered from the Tec-9; that, contrary to his statement to police, Qualls got a ride home with friends other than the defendants; that Lightner had a recent hand injury that interfered with his ability to grip a weapon; that gloves worn by James McGregor at the time of the incident were found to have gunpowder residue on them; and that two ballistics expert believe that, at some indeterminate time, a bullet was fired from inside the Roberts vehicle and passed through the door going outward.  The defense also sought to establish that Roberts was known to have a weapon in his possession at the time, as he had threatened another person at the Thornton club with it before hiding it behind the dashboard of his car.  Other witnesses corroborated

11

Locke's testimony that unknown people in a sports car had shot at Roberts' car after it left the club, but before the incident in question.

The defense also called Nakia Gilmore. She testified that she left the club with Mr. Lee in her car and crossed paths with a vehicle driven by Brian. She stated that Mr. Lee got out of her car and into Brian's car, and that she followed Brian's car down Martin Luther King Boulevard. She said Roberts' vehicle appeared and its occupants shot at Brian's car. She ducked until the shooting was over, then approached Roberts' car. She spoke to Roberts and Locke, and Roberts said words to the effect that "I hope we got them." On cross-examination, Gilmore confirmed that Brian, Mr. Lee, and Lightner were the occupants of Brian's car immediately before the shooting. She stated that Roberts' vehicle turned left onto the street, in between her car and the Brian vehicle, and approached the left side of the Brian vehicle. She saw flashes coming from the driver's side of Roberts' vehicle. At this point, she claims she stopped her car and ducked, although she also testified that occupants of Brian's car returned fire. After calling one final witness, the defense rested.

Mr. Lee moved for a mistrial, arguing that the prosecution had been unable to locate Locke after she had delivered her note. Mr. Lee's counsel pointed out that, during her testimony, Locke had been asked by the prosecution if she had used alcohol or drugs on the evening in question, and that she had denied doing so, contrary to the claim in her note. He pointed out that Locke was the only witness who positively identified Mr. Lee as being present and holding a gun at the time of the shooting, and stated that her absence "denies me the right to cross-examine her." He requested a mistrial, or, alternatively, the striking of Locke's testimony based upon a finding by the trial court "declar[ing] her incredible as a matter of law," continuation of the trial

12

until she could be found, or admission of her letter.[3]  The trial court opined that the letter was a deliberate attempt by Locke to cause a mistrial.  In denying the motion for mistrial, the trial court found that Locke had been extensively cross-examined and had offered shifting versions of her story; that the germane portion of her letter concerns her being intoxicated at the time she gave her statement and that the jury was able to assess her condition when reviewing the videotape; and that the court believed it was apparent to the jury that Locke was undoubtedly lying at some point, and that the information they already had before them made it possible for them to resolve which version of events was most accurate.  The trial court refused to admit the letter as an alternative, noting that it was hearsay and that to do so would deprive the prosecution of the opportunity to cross-examine Locke on its contents.  The judge opined that, in light of Locke's lack of credibility, the letter would have no effect whatsoever on the jury's deliberations in the case.

The court then conducted a charging conference.  The substantive discussion on instructions is not part of the record, but at its conclusion, Mr. Lee's counsel, after reserving objections with regard to the mistrial motion, stated that he had no objection to the proposed instructions or verdict forms.

The jury deliberated for approximately one day before returning with a verdict.  All three defendants were convicted of First Degree Murder by extreme indifference; of three counts of

_____

[3]Defense counsel also requested a mistrial due to the failure of witness Lawrence Lightner (no relation to defendant Eric Lightner) to appear for trial after being subpoenaed and told to return at a particular time. The defense proffered that Lightner would testify that Locke requested that he dispose of two pistols she had in her possession.  The apparent defense theory was that such pistols were used by occupants of the Roberts vehicle to shoot at the defendants the night of the incident.  The trial court refused to declare a mistrial.

attempt to commit murder in the first degree against Roberts, Locke, and Robert McGregor; were of Second Degree Assault upon Roberts; of conspiracy to commit assault in the first degree; and of conspiracy to commit menacing.  All three defendants were acquitted on the charge of conspiracy to commit murder in the first degree.  The court denied a defense motion challenging that the acquittal on the murder conspiracy charge and the conviction on the substantive murder and attempted murder counts were inconsistent, finding that "what the jury found was that they conspired to commit a first degree assault and in so doing killed this young man in extreme indifference.  I don't see anything the least bit inconsistent about that."  Each defendant was sentenced to a mandatory life term on the First Degree Murder count, and to a total of 50 additional years on the remaining counts.

### C.  Mr. Lee's direct appeals

Mr. Lee appealed his conviction to the Colorado Court of Appeals on five grounds: (i) that the trial court erred in failing to suppress evidence seized from certain vehicles; (ii) that Mr. Lee's Sixth Amendment right to confront was violated when Locke disappeared after sending a note recanting her testimony; (iii) the trial court should have granted a mistrial when Lawrence Lightner could not be located; (iv) the jury's verdicts were inconsistent, in the sense that Mr. Lee was convicted of First Degree Murder and attempted murder premised upon extreme indifference, but that the assault convictions required proof of specific intent; and (v) that there was insufficient evidence to support the verdict of murder by extreme indifference.

By unpublished order dated July 27, 1995, the Court of Appeals affirmed Mr. Lee's conviction in part, and vacated it in part.  The Court held that: (i) the trial court did not err in refusing to suppress the vehicle searches, citing to its ruling on the same issue in Brian's appeal,

14

*People v. Lee*, 914 P.2d 441, 445-46 (Colo. App. 1995); (ii) the failure of Lawrence Lightner to appear and testify was not grounds for a mistrial; (iii) there was sufficient evidence to support the convictions; and (iv) all of the convictions could be logically reconciled, with the exception of the conviction for attempted extreme indifference murder of Roberts and the convictions for conspiracy and assault involving Roberts.  To remedy the inconsistency, the Court of Appeals vacated the attempted murder conviction as against Roberts for the reasons stated in *Lee*, 914 P.2d at 447-48.  The issue with regard to Locke was not addressed in one version of the Court of Appeals' ruling that is included in the record, but another copy of that order in the record, identical but for the addition of an interstitial section concerning Locke, rejects Mr. Lee's argument on this point for primarily the reasons stated by the trial court.

Both the prosecution and Mr. Lee sought rehearing by the Court of Appeals, and both requests were denied.  Mr. Lee then sought certiorari to the Colorado Supreme Court, raising the same five issues that he raised before the Court of Appeals.  On April 8, 1996, the Colorado Supreme Court denied certiorari, rendering his conviction final.

**D.  Mr. Lee's collateral attacks in state court**

At some point in or about April 1997, Mr. Lee filed a post-conviction motion with the Colorado District Court pursuant to Col. R. Crim. P. 33 and 35(c).[4]  The Colorado District Court apparently held a series of hearings, and ultimately denied the motion.  In May 1999, Mr. Lee appealed the denial of that motion to the Colorado Court of Appeals, raising two issues:  (i) that there was newly-discovered evidence– namely, three new witnesses suggesting that Roberts and others in his car had weapons and fired at the Lee vehicle first, and that James McGregor was

---

[4]  As best this Court can determine, that motion is not included in the record here.

shot during a struggle with another person in the Roberts vehicle during a struggle over a weapon; and (ii) that the trial court gave an erroneous jury instruction on the issue of complicity. On December 2, 1999, the Court of Appeals affirmed the denial of the motion, agreeing that none of the newly-discovered witnesses would have offered evidence that would likely have led to Mr. Lee's acquittal.  In addition, the Court of Appeals conducted a plain error review of the un-objected-to complicity instruction.  Although appellate decisions after the trial had found the pattern jury instruction on complicity used at Mr. Lee's trial to be erroneous, the Court of Appeals concluded that because both Mr. Lee and his co-defendants had been convicted of the underlying substantive offenses, any defect in the complicity instruction did not affect substantial rights.

Mr. Lee again sought certiorari to the Colorado Supreme Court, raising the same two issues, but on April 24, 2000, the Supreme Court denied certiorari.

On or about June 30, 2000, Mr. Lee filed another Rule 35 motion in Colorado District Court, this time *pro se*.[5]  As best the Court can determine, Mr. Lee alleged that: (i) the trial court utilized defective jury instructions which deprived him of the presumption of innocence; (ii) the trial court erred in not giving a cautionary instruction when publishing photo evidence of James McGregor's body; (iii) the verdict forms failed to direct the jury to separate the principals from conspirators; and (iv) Mr. Lee had received ineffective assistance of counsel through trial, appeal, and the prior Rule 35 proceedings.  The motion was apparently denied as "repetitive," and Mr. Lee appealed the denial to the Colorado Court of Appeals, first *pro se*, and later, with the assistance of counsel.  In his appeal, Mr. Lee argued: (i) that the District Court erred in denying

---

[5]The motion is apparently not included in the record.

the motion without conducting a hearing or making factual findings; and (ii) that Mr. Lee received

ineffective assistance of counsel at trial, in that the proffered theory of the case instruction

essentially implicated Mr. Lee in the charged conspiracy.

On April 11, 2002, the Court of Appeals affirmed the denial of Mr. Lee's second Rule 35

motion.  Specifically, the court found that the theory of the case instruction reflected a strategic

decision by Mr. Lee's trial counsel to dispute the prosecution's *mens rea* element on the

complicity charges and to highlight the prosecution's burden of proof, and that such a strategic

choice was within the broad range of professional competence.  In addition, the Court of Appeals

concluded that there was sufficient evidence against Mr. Lee and thus, any error by his counsel

did not prejudice him.  Mr. Lee sought certiorari to the Colorado Supreme Court on the issue of

whether the failure to conduct a hearing on the motion was error, and on whether the Court of

Appeals decision on the merits of the motion was error.  The Colorado Supreme Court denied

certiorari on July 31, 2002.

### E.  The instant *habeas* petition

On January 3, 2003, Mr. Lee commenced the instant action *pro se* in this Court pursuant

to 28 U.S.C. § 2254.  Initially, the Petition (**# 3**) raised seven issues: (i) that the trial court's

failure to declare a mistrial following Locke's note deprived Mr. Lee of his right to confront

adverse witnesses in violation of the Sixth Amendment; (ii) that there was insufficient evidence to

support Mr. Lee's conviction of First Degree Murder; (iii) that the complicity instruction was

flawed and deprived him of a fundamentally fair trial in violation of the Due Process clause; (iv)

that the theory of the case instruction was flawed, resulting in Mr. Lee forfeiting the presumption

of innocence in violation of the Due Process clause; (v) that the trial court erred in supplying

17

verdict forms which did not require the jury to differentiate between principals and conspirators in violation of the Due Process clause; (vi) that the convictions against Mr. Lee are logically inconsistent, in violation of the Due Process clause; and (vii) that Mr. Lee received ineffective assistance of counsel, in violation of the Sixth Amendment, in that his trial counsel approved a defective theory of the case instruction, a defective complicity instruction, and failed to request the trial court to have its charge to the jury put on the record.

This Court directed that counsel be appointed **(# 22)** for Mr. Lee, and on January 21, 2004, counsel for Mr. Lee filed a Supplemental Memorandum of Authorities **(# 32)**.  That supplemental filing slightly recharacterized Mr. Lee's claims as follows: (i) the mid-trial disappearance of Locke and refusal of the trial court to grant a mistrial violated Mr. Lee's Fifth and Sixth Amendment rights; (ii) the failure of the trial court to read Locke's note to the jury violated Mr. Lee's Fifth and Sixth Amendment rights; (iii) Mr. Lee's Sixth Amendment rights were violated by his trial counsel's ineffective assistance in tendering the theory of the case instruction; (iv) Mr. Lee's Sixth Amendment and Due Process rights were violated by his counsel's not requesting that Mr. Lee be present for the charging conference; (v) Mr. Lee's Due Process rights were violated by the erroneous complicity instruction; (vi) Mr. Lee's Due Process rights were violated by the inconsistent verdicts as between the conviction on the charge of murder and the acquittal on the charge of conspiracy to commit murder; and (vii) Mr. Lee's Due Process rights were violated in that there was insufficient evidence to convict him of the charges.

On August 30, 2004, Magistrate Judge Coan issued a Recommendation **(# 52)** that the Petition be denied.  First, Judge Coan found that Mr. Lee had failed to exhaust his claim relating to not being present at the charging conference, failed to present the claim of inconsistency

18

between the murder conviction and the conspiracy acquittal as a federal claim and thus failed to exhaust it, and failed to exhaust his claim that there was insufficient evidence to convict him on any of the counts other than extreme indifference murder.  As a result, Judge Coan recommended that these claims (or parts of claims) be dismissed as unexhausted.

Turning to the merits, Judge Coan found that: with regard to Locke, Mr. Lee had had adequate opportunity to cross-examine her with regard to her credibility during the trial and that the additional cross-examination sought would have been merely cumulative, that the trial court did not err in refusing to read Locke's note to the jury, and  that under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), any error regarding Locke was harmless.  Judge Coan also found that the state courts' conclusions that there was sufficient evidence in the record to support Mr. Lee's conviction on the substantive murder count and the conspiracy to commit murder counts were not unreasonable, nor were the state courts' rulings on the defective complicity instruction.  Finally, Judge Coan found that the state courts' findings that Mr. Lee was not prejudiced by the alleged ineffectiveness of his trial counsel in tendering a theory of the case instruction were not unreasonable.[6]

On September 7, 2004, Mr. Lee filed timely Objections **(# 53)** to the Recommendation. Specifically, Mr. Lee objects to: (i) the findings that he failed to exhaust certain claims, and he states that he "relies upon his previous filed pleadings regarding those issues"; (ii) the conclusion of both the Magistrate Judge and state courts that Locke's credibility was so damaged that additional cross-examination regarding her note would have been cumulative; (iii) the Magistrate

---

[6]The Magistrate Judge did not address the state courts' finding that Mr. Lee's counsel's performance was not ineffective.

Judge's conclusion that it was not necessary for the jury to determine who actually shot the weapon that killed James McGregor; (iv) the finding that the complicity instruction need not require the jury to identify a principal and the finding that the legal error in that instruction did not constitute plain error; (v) the finding that Mr. Lee's trial counsel provided effective assistance, even though counsel did not tender an instruction highlighting Mr. Lee's contention that the weapon that killed James McGregor was never found.

## JURISDICTION

The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## ANALYSIS

### A.  Standard of Review

Where a party files timely objections to a Magistrate Judge's Recommendation, the Court reviews the objected-to portion of the Recommendation *de novo*.  Fed. R. Civ. P. 72(b).

Pursuant to 28 U.S.C. § 2254(d), *habeas* relief is appropriate only where the state court unreasonably applied clearly established federal law or reached a decision based on an unreasonable determination of the facts.  Mr. Lee bears the burden of demonstrating by clear and convincing evidence that the trial court's factual findings are erroneous.  28 U.S.C. § 2254(e)(1); *Trice v. Ward*, 196 F.3d 1151, 1169-70 (10th Cir.1999).

### B.  Exhaustion

Before pursuing *habeas* relief, a petitioner must first exhaust his available state court remedies.  28 U.S.C. § 2254(b); *Rose v. Lundy*, 455 U.S. 509, 520 (1982).  Exhaustion must be pursued through every available state court means, including a request for review before a court– such as the Colorado Supreme Court– whose appellate jurisdiction is discretionary.  *O'Sullivan v.*

20

*Boerckel*, 526 U.S. 838, 845 (1999).  The failure of a petitioner to fully exhaust a particular claim,

coupled with the expiration of the time permitted to raise such a claim under state procedural law,

results in a procedural default of that claim.  *Coleman v. Thompson*, 501 U.S. 722, 732-33

(1991).  Federal *habeas* review of a defaulted claim is prohibited unless Mr. Lee can show both

cause for the default and prejudice resulting from the alleged constitutional violation; in the

alternative, a petitioner can show that the court's refusal to consider the claims will result in a

fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

      The Magistrate Judge found that Mr. Lee failed to exhaust his claim arising from not being

present at the charging conference, his claim that inconsistency between the verdicts convicting

him of murder but acquitting him of conspiracy to commit murder amounted to a deprivation of

federal rights, and his claim that there was insufficient evidence to support the assault convictions.

Mr. Lee's Objections note his disagreement with these findings, but he does not present any new

and focused argument against them.  Instead, Mr. Lee merely refers the Court to his prior

briefing.

      Ordinarily, a failure to specify the grounds on which an objection to a Recommendation is

made is insufficient to preserve that objection.  *U.S. v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th

Cir.1996).  The case of *2121 E. 30th St.* involves a situation similar to the one presented here.

There, the party objecting to the Magistrate Judge's recommendation merely noted its

disagreement with the conclusion reached by the Magistrate Judge and pointed the District Court

to its prior briefs.  *Id.*  The 10th Circuit found that such objections "were not sufficiently specific to

preserve any issue for appellate review."  *Id.*  The same result is appropriate here.  The Court

deems Mr. Lee to have waived further consideration of the validity of the claims found unexhausted by Judge Coan.[7]

Mr. Lee has not argued that good cause exists for failing to raise these issues to the Colorado Supreme Court.  Accordingly, the Court overrules Mr. Lee's Objections and adopts that part of the Magistrate Judge's Recommendation that the Fourth Claim (that Petitioner was not present during the charging conference), the Sixth Claim (that the guilty verdict on the murder count and the acquittal on the conspiracy to murder count were inconsistent), and that portion of the Seventh Claim that asserts that there was insufficient evidence to convict Mr. Lee of any crimes other than extreme indifference murder, be dismissed as unexhausted.

### C.  Ability to confront Locke

Mr. Lee's First and Second Claims both raise Confrontation Clause issues with the trial court's handling of Locke's disappearance.  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  *U.S. Const.*, Am. 6.  The clause applies in both federal and state prosecutions.  *Crawford v. Washington,* 541 U.S. 36, 42 (2004).  It entitles an accused to "see[ ] the witness face to face, and [subject] him to the ordeal of a cross-examination."  *Id.* at 57, *quoting Mattox v. U.S.*, 156 U.S. 237, 244 (1895).

There is no dispute that Mr. Lee had a full opportunity to cross-examine Locke on the testimony she gave at trial, including her competence to give the videotaped statement.  It was

---

[7]Were the Court to consider the substantive arguments on these issues, it would nevertheless reach the same conclusion as the Magistrate Judge.  Complete exhaustion requires presentation of the issue to the Colorado Supreme Court in a petition for discretionary review.  None of Mr. Lee's petitions for certiorari to the Colorado Supreme Court present these issues.

only after Mr. Lee concluded that cross-examination, when Locke's note was disclosed, that he desired an additional opportunity to examine her.   For analytical purposes, this is akin to a situation in which a witness completes testifying and leaves the stand, then later recants that testimony.

The majority of cases examining the situation involve recantation occurring some time after the trial has concluded, but at least one court has faced the situation presented here.  In *Bagby v. Kuhlman*, 932 F.3d 131, 133-34 (2d Cir. 1991), the prosecution called a witness, Mann, who testified that the defendant had access to an apartment where controlled substances were found.  The day after her testimony, Mann contacted defense counsel and stated that she wished to recant her testimony.  *Id.* at 133.  When defense counsel recalled Mann in his own case, she invoked her Fifth Amendment privilege and refused to answer any questions.[8]  *Id.* at 133-34. The Second Circuit rejected the defendants argument under the Confrontation Clause because Mann's recantation and subsequent refusal to testify occurred "<u>after</u> Bagby had vigorously and pointedly cross-examined her about every material aspect of her direct testimony."  *Id.* at 135 (emphasis in original).  The question, as framed by the Second Circuit, was "whether Bagby was improperly precluded from questioning Mann about her recantation and thereby denied an opportunity to test the truth of Mann's direct testimony."  *Id.* at 136.  After examining the various circumstances of the recantation, the Second Circuit ultimately concluded that "the purported recantation was not trustworthy and, therefore, did not necessitate any additional cross-examination," and

---

[8]Curiously, the Court notes that had the trial court been successful in locating Locke, it would likely have ensured that Locke first have an opportunity to consult counsel, as she, like the witness in *Bagby*, faced a possible charge of perjury based on her recantation.  One can assume that, after consultation with an attorney, Locke might very well have invoked her Fifth Amendment privilege.

that "Bagby had adequate opportunity to cross-examine Mann and [we] are unpersuaded that Mann's assertion of the Fifth Amendment on recall deprived Bagby of a meaningful opportunity to test the truth of Mann's direct testimony." *Id.*

Thus, *Bagby* indicates that the Confrontation Clause issue in these circumstances requires analysis of two separate questions: whether the recantation was sufficiently trustworthy to warrant additional cross-examination, and whether the defendant had an adequate opportunity to test the truth of the witness' actual trial testimony. In considering these questions, this Court is mindful that it must defer to factual findings by the trial court unless Mr. Lee shows by clear and convincing evidence that such findings are in error. 28 U.S.C. § 2254(d)(2); *Trice*, 196 F.3d at 1169-70.

The trial court here found that Locke's recantation was not trustworthy. When her recantation was first discussed the morning after Locke's note, the trial court stated that "She is one of the most transparent liars I have ever seen in my life. There is nothing surprising about it."[9] Trial Record, v. 15 at 15-16 (April 23, 1993). On the following day, Mr. Lee's counsel moved for a mistrial or various alternative relief because of Locke's disappearance. At that time, the trial court observed that Locke's behavior was "a deliberate attempt to cause a mistrial. . . a transparent, calculated attempt to cause a mistrial. I don't know who these individuals think they're trying to fool, but this is not the first time I have seen a stunt like this pulled." Trial Record, v. 16 at 42-43 (April 28, 1993). Later, the trial court again discussed Locke, observing that "I'm sure the jury is thoroughly convinced this woman at some point in time is a liar." *See*

---

[9]The trial court repeated the observation that Locke was "one of the most obvious liars I have ever seen" on the final day of the trial. *See* Trial Record, v. 16 at 41 (April 28, 1993).

Trial Record, v. 16 at 57 (April 28, 1993).  More to the point, the trial court observed that the

only relevant assertion in the note was Locke's claim that she was under the influence of alcohol

and drugs at the time she gave her statement.  With regard to that claim, the trial court stated that

"the jury has before it the videotape of her being interviewed at the Police Department, which I

viewed, which clearly demonstrates she is not intoxicated." *Id.*  But perhaps the most telling

indication that the trial court did not consider Locke's recantation to be trustworthy is its

statement that "do I think this letter, if it's given to the jury will have any effect whatsoever in the

outcome of this case, and my answer to that is no, I don't think it does or will have." *Id.* at 58.

From these statements, the trial court found Locke's recantation of her testimony to be

untrustworthy.

       The trial court also found that Mr. Lee had availed himself of his opportunity to fully

cross-examine Locke as to the truth of the testimony she gave.  Denying Mr. Lee's request for a

mistrial, the trial court stated that "Miss Locke was cross-examined at great length throughout the

trial," Trial Record, v. 16 at 56; see also *id.* at 57.  The trial court's findings are consistent with

the facts shown by the trial transcript.  Mr. Lee's counsel devoted a substantial portion of his

cross-examination of Locke to addressing whether she had drunk alcohol the night of the incident.

His counsel intimated in his questions that Locke had admitted to Mr. Lee's investigator that she

had had numerous drinks that night.  *See* Trial Record*, vol. 14 at 101-104 (April 22, 1993).

Although Locke denied any alcohol use and denied having told Mr. Lee's investigator otherwise,

the issue was clearly raised for the jury's consideration, and the videotape of Locke– in her

allegedly intoxicated state– was played for the jury shortly after her testimony finished.

25

Thus, the trial court made factual findings regarding both factors to be considered under *Bagby*. Mr. Lee has not shown those findings to be erroneous by clear and convincing evidence, and this Court must therefore adopt them. Consequently, guided by *Bagby*, this Court finds that the trial court's denial of a mistrial based on Locke recantation did not deprive Mr. Lee of his rights under the Confrontation Clause.

Mr. Lee raises several arguments in his Objections with regard to Locke. First, he notes her importance to the case, in that she was the only witness who positively identified him as holding a gun at the time of the shooting. Undoubtedly, such testimony was crucial to the case, just as the testimony of the witness in *Bagby* was critical to the case against him. However, the court in *Bagby* observed that importance of the testimony was just a threshold issue; the primary inquiry was whether the defendant was deprived of a meaningful opportunity to test the witness' credibility. *Id.* at 135. For the reasons stated above, this Court agrees with the trial court's finding that Mr. Lee was not deprived of a meaningful opportunity to test Locke's credibility.

Mr. Lee also cites to *Crawford* for the proposition that "statements taken by police officers in the course of interrogations are also testimonial." 541 U.S. at 52. The precise significance of this citation is not apparent to the Court. *Crawford* deals with the admissibility of testimonial hearsay, such as witness statements taken by police. It has no apparent application to the admissibility *vel non* of Locke's unsworn note,[10] or her prior testimony that was subject to cross-examination. Although *Crawford* might have some relevance to whether the trial court

---

[10]If anything, *Crawford*, which holds that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," 541 U.S. at 59, would have required that the trial court refuse to admit Locke's note, as the prosecution had not had an opportunity to cross-examine Locke with regard to its contents.

should have admitted Locke's videotaped statement in the absence of live testimony, that issue is not raised here.

Mr. Lee also contends that he did not have an opportunity to call Locke in his case-in-chief, and that he "is not aware of any case that says that you should lay all your cards on the table in the prosecution's case because the witnesses might disappear on you and you may not get a chance to examine them later."  It is not clear how this argument bears on the Confrontation Clause issue.  Nevertheless, Mr. Lee's belief, that is a risk that defense counsel in both civil and criminal litigation face every day, and for which strategic planning is essential.  In any event, it is not clear what "cards" Mr. Lee kept in his hand, as the key issue in Locke's note– her competence at the time of her videotaped statement– was a subject that Mr. Lee took the opportunity to address fully on Locke's cross-examination.[11]

Mr. Lee also argues that "Ms. Locke provided new and damaging information to the prosecution's case during the middle of trial and then disappeared[;] Mr. Lee should have been given an reasonable opportunity to investigate the new information and its impact."  There is no indication from the record that Mr. Lee did not have an opportunity to "investigate" Locke's claim of intoxication.  After her tender of the note to the court, trial continued for several more days, including an intervening weekend, allowing Mr. Lee plenty of opportunity to develop a strategy to highlight Locke's condition at the time of her statement.  Mr. Lee had reasonable basis

_____

[11]Interestingly, despite Locke's note, delivered early in the prosecution's case, the defense did not explore the issue of Locke's allegedly impaired state with any of the numerous police officers and civilian witnesses who interacted with Locke that evening.  In fact, the defense did not even raise the issue with Gilmore, a witness friendly to the defense, who had spoken with Locke immediately after the shootings, at a time when Locke's ability to perceive was most critical.

to believe that Locke might not return for additional testimony as early as the same day her note was tendered, as Locke disregarded the trial court's instructions to stay in the building, and instead, failed to contact her probation officer as she had represented she would do.

Thus, because the trial court's refusal to grant a mistrial or otherwise seek to remedy Locke's purported recantation and subsequent disappearance did not violate Mr. Lee Confrontation Clause rights, the First and Second Claims in the Petition are without merit and are denied.

### D.  The Theory of the Case Instruction

Next, Mr. Lee contends that his trial counsel was ineffective in proffering a theory of the case instruction that allegedly implicated Mr. Lee.

Under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Court analyzes claims of ineffective assistance of counsel using a two-part test: (i) Mr. Lee must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (ii) that he suffered prejudice as a result.

Mr. Lee claims that his counsel's theory of the case jury instruction admitted that Mr. Lee was present in the Lee vehicle at the time of the shooting, and strongly implied that Mr. Lee was aware of the intentions of his co-defendants:

> It is the [Petitioner's] theory of the case that he did not shoot any weapon during the early morning hours of June 14, 1992. Specifically, any shots fired from the blue Cutlass were discharged by other individuals within that vehicle over whom [Mr. Lee] had no control, or for which he can be held accountable, unless proof beyond a reasonable doubt is presented that would establish that he either conspired with, or was a complicitor with, any of the other individual (sic) as defined by these instructions.

28

> In addition, [Mr. Lee] contends that any shots fired from the blue
> Cutlass were a result of shots first being fired at that vehicle by the
> occupants within the vehicle driven by Damon Roberts.
> Specifically, any shots discharged were defensive in nature and
> were not intended to cause any injury or death to any occupant
> within Damon Roberts' vehicle, and were discharged in an attempt
> to prevent any further shooting from the occupants within Damon
> Roberts' vehicle.  Finally, any shots fired from the weapon which
> caused the death of James McGregor came from a weapon that was
> not within the possession or control of [Mr. Lee].

The quoted instruction does not actually concede any facts, particularly the fact that Mr. Lee was in the Lee vehicle at the time.  However, it emphasizes the argument that Mr. Lee did not have the requisite *mens rea* for any of the murder-related charges, or that, in the alternative, that he was merely acting in self-defense.  This appears to have been a strategic decision made by Mr. Lee's counsel based on the evidence in the case.  Strategic decisions made by counsel after full investigation of the law and facts are virtually unchallengeable under *Strickland,* and entitled to a "heavy measure of deference."  466 U.S. at 690-91.  The question for this Court is whether this decision was reasonable under the circumstances.

The Court finds that it was.  At least three witnesses gave testimony that suggested that Mr. Lee was in the Brian vehicle at the time.  Locke testified that she personally observed Mr. Lee in the vehicle.  Gilmore testified that, immediately before the shooting, she let Mr. Lee out of her car and he got into the Lee vehicle, and moments later, the Roberts vehicle approached and shots were exchanged.  Qualls testified that Mr. Lee and Brian left together, expressing an intent to go kill Roberts.  In light of this testimony– particularly the testimony of Gilmore, Mr. Lee's girlfriend– and in the absence of any alibi testimony establishing Mr. Lee's presence elsewhere at the time, the Court cannot say that Mr. Lee's counsel's decision to emphasize theories other than

his absence from the vehicle was unreasonable.  Rather then lose credibility with the jury by asking it to find that Mr. Lee was not present despite compelling evidence to the contrary, Mr. Lee's counsel's decision to focus on other defenses reflects the type of strategic, informed choice that falls within the broad range of professional conduct.  Mr. Lee's arguments of inadequate *mens rea* and, to a lesser extent, self-defense, appeared to be more fruitful areas based on the evidence.

In his Objection, Mr. Lee specifically asserts that his counsel should have highlighted for the jury that the bullet that killed James McGregor was found to come from a weapon that was never recovered, a weapon that even Locke did not accuse Mr. Lee of having.  Although the Court agrees that this, too, was a valid theory of the case that could have been pressed by Mr. Lee's counsel, the failure to do so does not reflect ineffective assistance.  Notably, such a defense might exculpate Mr. Lee from the substantive crime of murdering James McGregor, but it would do little to acquit him of the conspiracy to murder and assault claims.  In other words, although such an argument might have convinced the jury that Mr. Lee did not fire the shot that killed James McGregor, it would not prevent them from finding that Mr. Lee shared a common plan with the individual who did fire the fatal shot, thus potentially allowing Mr. Lee to be convicted of the conspiracy to murder charge instead.[12]  More importantly, the record indicates that Mr. Lee's counsel <u>did</u> discuss the issue, albeit briefly, in his closing argument:

> The district attorney goes in, excuse me, into ditching the gun. . .
> I'm wondering when the district attorney is going to tell you who
> held which gun and shot which gun?  The evidence is in.  Argument

---

[12]The Court does not consider the fact that the jury ultimately acquitted Mr. Lee of the conspiracy to murder charge.  The assessment of the reasonableness of counsel's decisions cannot be made in hindsight after learning of the jury's verdict.

is just argument.  To say a person had this or that is a guess, and
nowhere in those instructions does it say that you can guess.

The point I think I was making, the district attorney said to you,
because again, I was waiting for the answer at some point, what
happened to the other gun, or guns?  Because if you remember
Detective Kerber he couldn't say if these bullets were recovered
from Mr. McGregor or Mr. Roberts came from the same gun.

Finally, you get an answer from the district attorney that nowhere is
it to be found in the evidence they ditched that gun and kept the
other gun for sentimental value.  Where did that come from?  That
pre-supposes that they knew that was a gun they needed to ditch.

Trial Record, v. 16 at 117.

Because Mr. Lee's counsel chose to highlight a theory of defense that was reasonably

supported by the evidence, the Court finds that his performance was within the broad range of

acceptable professional conduct, and thus, was not ineffective.  The Court need not reach the

second *Strickland* prong of prejudice.  Mr. Lee's Objections to the Recommendation are

overruled, and the Court adopts the Recommendation that Claim Three be denied.

### E.  The Complicity Instruction

Mr. Lee contends that the improper complicity instruction given by the Court deprived

him of Due Process.  The jury instructions given by the trial court were not transcribed in the

record, but Mr. Lee's brief to the Colorado Court of Appeals on this issue indicates that the

following instruction was given:

A person is guilty of an offense committed by
another person if he is a complicitor.  To be guilty as
a complicity, the following must be established
beyond a reasonable doubt:

1.  A crime must have been committed.

31

> 2.  Another person must have committed <u>all or part of</u> the crime.
>
> 3.  The defendant must have had knowledge that the other person intended to commit <u>all or part of</u> the crime.
>
> 4.  The defendant did intentionally aid, abet, advise, or encourage the other person in the commission or planning of the crime.

*See Docket* # 14, Attachment M at 9 (emphasis added).

Several years after Mr. Lee's trial concluded, the Colorado Supreme Court held that the "all or part of" language in the above-quoted pattern instruction is erroneous.  *People v. Rodriguez*, 914 P.2d 230, 276 (Colo. 1996).  Without engaging in extended analysis of the issue, the Colorado Supreme Court in *Rodriguez* agreed with the defendant's contention that, because of the "all or part of" language, the instruction permitted the jury to convict the defendant of the substantive crime under a complicity theory even though it found that the defendant was complicit in only <u>some</u> of the elements; in *Rodriguez*'s case, the defendant argued that the defective instruction could permit a conviction for first degree murder on a complicity theory even though the jury found that he had only agreed with the principal to assault the victim.  *Id.*

The Colorado Supreme Court revisited the "all or part of" language of the instruction the following year in *Bogdanov v. People*, 941 P.2d 247, 255-56 (Colo. 1997).  Acknowledging that *Rodriguez* characterized the "all or part of" language as error, the court in *Bogdanov* retreated from that blanket assertion, recognizing circumstances in which the "all or part of" language is appropriate.  The court cited an example in which two persons conspire to engage in the crime of robbery, which has two elements: (i) the taking of property from another, and (ii) the use of

violence. *Id.* at 256.  In the court's example, two people conspire to rob a victim– one person

assaults the victim with a knife while the other steals the victim's money.  In this circumstance,

the court observed that neither person has committed every element of the crime of robbery;

rather, each person has committed only "part of" the crime.  In this circumstance, it would be

appropriate to use the "all or part of" language in a complicity instruction, as complicity requires

only that all of the elements of the crime be committed, not that any single person has done so.

*Id.*  By contrast, in cases where two persons conspire to commit a crime, and one of the two

commits all of the elements of the crime and the other does not commit any of the elements, a

complicity instruction containing the "all or part of" language is error.  *Id.*

   In ruling on Mr. Lee's argument on this issue, the Colorado Court of Appeals found that

the instruction was erroneous, but that the error was harmless.  *Docket* # 14, Attachment P at 6-7.

The court considered that the jury's verdict of guilt on the substantive murder charge could have

resulted from the jury finding that Mr. Lee was the principal responsible for James McGregor's

death; in that circumstance, the complicity instruction was moot.  Or, the jury could have found

that another principal shot McGregor, but regardless of who that principal was, the evidence

could not have permitted the jury to find that that principal committed only part of the crime.  *Id.*

   The Fourteenth Amendment to the U.S. Constitution guarantees every defendant in state

court the right to Due Process.  However, not every ambiguity, inconsistency, or deficiency in a

jury instruction rises to the level of a Due Process violation.  The question to be considered is

"whether the ailing instruction so infected the entire trial that the resulting conviction violates Due

Process."  *Middleton v. McNeil*, 124 S.Ct. 1830, 1832 (2004) (internal quotes omitted).  This

Court must inquire whether "the error had a substantial and injurious effect or influence in

determining the jury's verdict" and whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Turrentine v. Mullin*, 390 F.3d 1181, 1191 (10th Cir. 2004).

Mr. Lee's raises two distinct arguments relating to the complicity instruction. First, he contends that the instruction was defective because it permitted the jury to find complicity without affirmatively identifying who is "the other person," *i.e.* the principal. Mr. Lee does not cite to any legal authority for the proposition that a complicity instruction that does not require the jury to identify the principal constitutes a deprivation of Due Process. Absent such authority, this Court is not prepared to find that Due Process requires a jury to affirmatively identify a principal before convicting a defendant of complicity. Indeed, the law appears to be to the contrary. *See e.g. U.S v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004) (affirming conviction where prosecution did not specify whether it considered defendant a principal or complicitor); *see also Bernal v. People*, 44 P.3d 184, 212 (Colo. 2002) (dissenting opinion) ("it is to longer necessary in this jurisdiction to distinguish principals of various degrees and accomplices"). Thus, this Court finds no Due Process violation on these grounds.

Mr. Lee's second argument is more complex. He contends that the portion of the instruction that permitted a finding of complicity where Mr. Lee had knowledge that another person intended to commit "all or part of" the substantive crime was erroneous. Mr. Lee contends in his Objections, "the 'all or part of' language broadens the crime to driving to the scene of the crime. . . under the instruction given, the mere driving to the scene could account for 'all or part of' the crime. . . ." (Emphasis omitted.)

34

As discussed above, the "all or part of" language is not *per se* erroneous. *Bogdanov* explains that the language is proper where the evidence permits a conclusion that two persons jointly committed a crime, but where neither person individually committed all of the elements necessary to establish the crime. However, the Court of Appeals found that, under the facts of this case, it could not be said that Mr. Lee's co-defendants committed only part of the crime of extreme indifference murder. Under these circumstances, Mr. Lee is correct that the "all or part of" instruction was error. *Bogdanov*, 941 P.2d at 256 ("where one principal alone committed all elements of the crime, we see no need for the jury instruction on complicity to contain the 'all or part of' language"). However, an erroneous instruction does not necessarily require relief. This Court must nevertheless determine whether that error had a substantial and injurious effect or influence in determining the jury's verdict. Considering the totality of the circumstances, the Court concludes that the error did not deny Mr. Lee Due Process.

The Court begins with the observation that there is sufficient evidence in the record to support a jury verdict which found Mr. Lee to be liable for extreme indifference murder as a principal. For reasons stated in greater detail below, the jury could reasonably have concluded that Mr. Lee fired the shot that killed James McGregor. Because the jury could have convicted Mr. Lee as a principal, any defects in the complicity instruction are irrelevant, as such an instruction would not have been material to the jury's verdict.

However, assuming that the jury convicted Mr. Lee as a complicitor, rather than a principal, a reasonable jury could not have determined that the Mr. Lee aided and abetted a co-defendant who only committed <u>part of</u> the offense. The crime of extreme indifference murder has three elements: (i) that the defendant engaged in conduct posing a grave risk of death to another;

35

(ii) that the defendant did so with universal malice reflecting extreme indifference to human life; and (iii) that the result of that conduct was the death of another person. C.R.S. § 18-3-102(d); *see e.g. People v. Moore*, 902 P.2d 366, 368-69 (Colo. App. 1994). The prosecution's theory was that Mr. Lee and Lightner each fired shots at the Roberts vehicle, one using a Tec-9 pistol and damaging the car and injuring Roberts, and the other using a .38 or .357 caliber weapon to fire the shot that killed James McGregor. According to the defense, Locke's videotaped statement to the police placed the Tec-9 in the hands of Mr. Lee, suggesting that Lightner was the principal whose shot killed McGregor. Under these circumstances, however, Lightner committed <u>all</u> of the elements of extreme indifference murder, as the act of firing a weapon into a moving car is the type of conduct falling within the definition of extreme indifference, and that conduct resulted in James McGregor's death. *See e.g. People v. Jefferson*, 748 P.2d 1223, 1232 (Colo.1988). If Lightner committed <u>all</u> of the elements of the crime of extreme indifference murder, the defect in the complicity instruction was harmless. *See e.g. Bogdanov*, 941 P.2d at 256 (where co-defendant committed <u>all</u> of the elements of the principal offense, use of the defective complicity instruction was not plain error).

This is not a situation in which there was evidence to suggest that Mr. Lee intended to assist his co-defendants in performing some act short of murder, which is the situation in which the defective instruction becomes prejudicial. *See e.g. Rodriguez*, 914 P.2d at 276 (defense argument that defendant intended to aid in an assault on the victim, but did not intend that victim be killed). Qualls' statement to the police indicates that Mr. Lee knew that Brian intended to kill someone at the time they began searching for Roberts' car. The flaw in Mr. Lee's argument on this point is evident from the example he gives. Mr. Lee supposes that the jury might have

36

convicted him by finding that his decision to join the co-defendants in "driving to the scene" constitutes "part of" the crime.  The mere act of driving to the scene of the crime is not an action that satisfies any of the elements of the crime of extreme indifference murder– it does not pose a grave risk of death, it does not reflect universal malice, and it did not cause the death of James McGregor.  Thus, it is not "part of" the crime that could result in Mr. Lee being convicted on a complicity theory.  Assuming the jury convicted Mr. Lee as a complicitor, it must have necessarily concluded that Mr. Lee had the requisite mental state to commit the crime of extreme indifference murder, and that he assisted or encouraged his co-defendants to carry out that crime.  There is evidence to support such a finding.

Mr. Lee contends that the harm done by the erroneous complicity instruction is shown by the inconsistency between the jury's verdicts.  Assuming he was not convicted as a principal (an assumption this Court cannot make), he argues that his conviction as a complicitor would be inconsistent with the jury's verdict acquitting him of conspiracy to commit extreme indifference murder. On the surface, this argument is appealing, as it is difficult to envision how Mr. Lee could have intentionally aided a co-defendant's commission of the murder without Mr. Lee at least tacitly agreeing to help carry out the crime.  However, the U.S. Supreme Court has held that inconsistency in verdicts is not a basis for granting *habeas* relief.  *U.S. v. Powell*, 469 U.S. 57, 65-66 (1984) ("Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but . . . it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. [N]othing in the Constitution would require such a protection").  Cautioned by the Supreme Court, this Court will not attempt to second-guess the jury's decision to convict on one charge

and acquit on a similar one.  It is sufficient to find that the error in the complicity instruction, to the extent there was any, did not substantially influence the jury's verdict.  Mr. Lee's request for *habeas* relief on this ground is denied.

### F.  Sufficiency of the evidence

Finally, the Court turns to Claim Seven.  The only fully exhausted portion of this claim challenges the sufficiency of the evidence to convict Mr. Lee of extreme indifference murder.

In a *habeas* petition, federal courts can review a claim that there was insufficient evidence at trial to support a conviction.  In doing so, the Court must draw all inferences in favor of the prosecution and grant relief only if it concludes that no reasonable trier of fact could have found all essential elements of the crime beyond a reasonable doubt.  *Hererra v. Collins,* 506 U.S. 390, 401 (1993), *citing Jackson v. Virginia*, 443 U.S. 307 (1979).

Considered in the light most favorable to the prosecution, Qualls' statement, by itself, is enough to support the verdict of guilt.  It establishes that Mr. Lee knew that his co-defendants intended to murder Roberts that evening when they left the Lee residence.  It also establishes that Brian stated that Mr. Lee had been shooting at the other vehicle during the incident, an act which constitutes extreme indifference under Colorado law.  These two statements, coupled with evidence that James McGregor was killed, establish all of the elements of extreme indifference murder.  The videotaped statement of Locke confirms and the testimony of Nakia Gilmore further confirm that Mr. Lee was in the Lee vehicle during the incident, and Locke's statement also confirms that Mr. Lee was firing a weapon at the Roberts car.  For the reasons discussed previously, a reasonable trier of fact could consider this evidence sufficient to constitute extreme indifference murder under either a principal or complicitor theory.

Mr. Lee's Objections on this issue focus on the fact that the jury never identified who it considered the principal and who it considered the complicitors. As Mr. Lee puts it, "the jury did not 'put the gun in the hand of one of the defendants.'" Although this is true, it is legally irrelevant. As stated previously, there is no constitutional requirement that the jury expressly separate the principals and complicitors in a verdict. More importantly, on *habeas* review, the Court does not require the jury to "put the gun in the hand" of a defendant, it merely examines the record to see if there is evidence which, considered most favorably to the prosecution, puts that gun there. Statements by both Locke and Qualls put a gun in the hand of Mr. Lee, and that is sufficient. Whether that gun was the gun that killed James McGregor, whether Mr. Lee actually fired it, and all the various arguments and positions presented by both counsel were matters of evidence and inference for the jury to weigh, and once the Court finds sufficient evidence in the record to support the jury's conclusions, it cannot second-guess them. *Jackson*, 443 U.S. at 318-19. Such sufficient evidence exists here.

## CONCLUSION

For the foregoing reasons, Mr. Lee's Objections (**# 53, 54, 56**) are **OVERRULED**. For the reasons stated herein, the Court **ADOPTS** the Recommendation (**# 52**) of the Magistrate

Judge that the Petition be dismissed in part and denied in part, and the Court **DISMISSES** the Fourth Claim, Sixth Claim, and the unexhausted portions of the Seventh Claim in the Petition (**# 3**), and **DENIES** the remaining claims.  The Clerk of the Court is directed to close this case.

Dated this 7th day of November, 2005

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

40